The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention, for the court is now sitting. God save the United States and this Honorable Court. Yes, the first case is 20-2167. Mr. Lambert. May it please the court. League of Women Voters v. Andino. Mr. William Grayson Lambert. Yes, sir. Thank you, Judge King, and may it please the court. The district court in this case entered a preliminary injunction that did two things. First, the injunction prohibited county boards of election from matching the signature on an absentee ballot with the signature on a voter's file. Second, the injunction invited county boards to match signatures if the county boards first obtained the district court's approval of their notice and cure procedures. Both parts of this injunction are flawed. The first part is flawed because it exceeds the district court's authority. As the district court itself said, if it entered an injunction in this case, it was sent. Mr. Lambert, can I ask, before you get into the merits, the issue of standing was not briefed by either party. But I have a question about the league's organizational standing. Do you have a position on that? Your Honor, our position would be that all of the plaintiffs here lack standing because none of them can meet the three basic requirements of the Lujan test. If you would please focus on the league rather than the individuals. Certainly, Your Honor. The issue with the league is that there's no injury in fact. The underlying premise of the complaint is that absentee ballots of their members will be rejected because of the supposed signature matching without proper procedures. But in light of the directive that was issued by Director Andino the day before the injunction was entered, there is no more signature matching in South Carolina, which means there's no injury in fact for any member of the league. I'm sorry to keep interrupting you after asking questions, but I'm really trying to get at whether the league satisfies the type of standing that's addressed by our lane decision and the Havens Realty about whether this sufficiently impacts their mission. Is there anything more than diversion of resources that would create standing under those cases? I don't believe so, Your Honor, and they certainly haven't pled anything other than a diversion of resources theory. The other issue here is that they're not needed to pursue these claims on behalf of anyone because certainly their individual members are more than capable of filing this lawsuit were they to have any injury that could arise from what happened. And Judge Qualabong, I think you're right to go to the Article 3 issues in the first instance. And while we think standing is a concern, the other problem here is mootness. So even if they can get over the standing hurdle, the case is moot. The very day Director Andino filed her supplemental declaration that said, in fact, our survey revealed nine counties were matching signatures, she also issued a directive that said simply, if you are matching signatures, you must cease immediately. And if you have set any ballots aside based on signature matching, you must put them with the ballots to be counted. Therefore, at that point, there is no... Mr. Lambert, this is Judge Floyd. Under South Carolina law, did the commission ever change its position on the legality of signature matching? No, sir, Judge Floyd, and here's why. Section 7-15-420, which is the provision of South Carolina law in dispute, is unambiguous. Because it's unambiguous, there is no need for agency interpretation of this. They are bound to apply the law as the General Assembly wrote it. I think this statute is unambiguous for at least two reasons. The first is that under South Carolina law, agencies only have that authority which is expressly given to them by the General Assembly. The plaintiffs in this case... The statute says there cannot be that signature matching in South Carolina. I didn't see that part. The statute does not say expressly... It's clear, but I can't find that in there. That's what you all say it says, but that's not what the statute says. Judge King, I'll grant you that the statute does not explicitly say there may be no signature matching with absentee ballots, but two rules of statutory construction mean that's exactly what the statute provides for. And the first is I was just saying... No, you're saying it explicitly says that. You're saying it implicitly says that. It doesn't explicitly say that. So I thought we interpreted statutes based on what they say, not what one of the lawyers says it says. We interpret statutes, Judge King, based on the rules of statutory construction, and there are two rules of statutory construction here that both point to the same result of signature matching is not permitted. The first is that under South Carolina law, agencies only have that authority... I'm not saying you're not right that that's what it means, but you said it said that, and it does not say that. Your Honor, if I said the statute explicitly said no signature matching, then I misspoke. To be precise, the statute using standard tools of statutory construction is unambiguous in that signature matching is not permitted. Why don't you go to the legislature and get them to amend it and just simply say that? Your Honor, the General Assembly... That's what they wanted to say. Well, the General Assembly could amend the statute, Your Honor, but we think that would be unnecessary for two reasons. One is the statute does not explicitly provide for signature matching, and because agencies only have the authority granted to them by the General Assembly, the lack of authority to match signatures means that the authority doesn't exist. The second rule of statutory construction is the rule that when a legislature uses words in one part of a statute but does not use them in another, that means that the omission is intentional. In South Carolina's voting laws, Section 7-11-85 deals with candidates trying to get on the ballot by petition, and that provision expressly provides for signature matching. It says that, quote, the signature must be checked. Mr. Lambert, if I could, but all that lull was there before. You know, the survey that discovered that there were people or counties, you know, actually engaged in some sort of matching. I appreciate the subsequent issuance of the directive, but even whether the law is explicit or implicit on your point, I don't understand how that makes it moot, because that was the circumstance before the nine counties were engaged in the matching that led to the injunction in the first place. Judge Caldwell, whether or not the counties are right in interpreting it now, fundamentally, South Carolina law gives the executive director of the commission the authority to resolve disputes with county boards. That's Section 7-3-25. When Director Zandino's directive was issued on October 26th, that forbade any county board from continuing signature matching, however it may interpret Section 4-20. And once they're forbidden from doing that, that was the end of any possibility of signature matching. I think it's important to be clear here on a couple of points. One is the district court found below that the commission was genuinely unaware that signature matching was taking place, and Director Zandino said that in her 17 years as executive director, which is how far back our institutional memory goes, there have been no policies, no training, there's been nothing about signature matching. And if you compare to the record... Mr. Lambert, that's not exactly true, because if the law always prohibited signature matching, why didn't the commission tell Charleston it could purchase signature verification software? Judge Floyd, the conversations with Charleston, I don't know the details of all of them. What I do know ultimately is they were told they couldn't use commission funds because it wasn't a procedure that had been approved. Charleston County never brought it back up again, and as far as the commission knew, that was the end of any attempt to match signatures. So no one at the commission then thought that any county was going to go ahead and proceed with doing that. But going back to the petition candidates, because I do think this is particularly important in interpreting the statute, that section says that signatures must be checked for validity against the signatures of the voters on the original application for registration. The General Assembly knew how to require signature matching when it wanted to. It did that for petition candidates in 1984. Just two years before, in section 420, it did not require that, which suggests that if the General Assembly had thought it was already requiring signature matching in 420, it could have used the exact same language that was in 420. The difference there is ultimately significant. Now, because there's no signature matching that can happen, the case is moved. But also, even if it's not, the injunction is improper. Did you present a mootness issue to the district court contention? We did not, Judge King, because the directive was filed on the evening of October 26th. The injunction was entered the morning of the 27th. There was no opportunity. But mootness is an Article 3 issue. Why couldn't you have gone back on the afternoon of the 27th and claimed it was moot? Why couldn't you have gone back after the appeal was filed and claimed it was moot? The urgency we moved with in this court was simply because election day was seven days away, and we needed a resolution to whether or not any part of it could be stayed pending during appeal. The district court has since stayed the case pending this appeal to see how that might impact anything going forward. I see that my time has expired, and I look forward to reply. Any other questions, Judge Foley, Judge Quattlebaum? No, sir. Not for right now. Thank you. Okay. Mr. Hall? I am Kevin Hall, representing the South Carolina Speaker of the House and the President of the Senate. We join in the argument that Mr. Lambert just advanced and want to reinforce a couple of important points, specifically from the perspective of the legislature itself. As Mr. Lambert began, a United States district court does not have the authority to tell or order state officials to follow state law, and we rely on the Pennhurst case for that authority. But the district judge can compel them to adhere to the Constitution of the United States. That is correct, Your Honor. And that was the issue that Judge Gergel says he was dealing with. It says that right on the first page of his opinion. Well, Your Honor, he acknowledges and acknowledged in oral argument that any injunction that he issued for bidding signature matching would be, quote, simply to comply with state law and not to violate state law. Judge Gergel understood and knew and made clear to the parties, and frankly, the parties all agreed at the time, that there was no question under South Carolina law that signature matching was not permitted. The reference to a constitutional issue comes... That's the same thing that Mr. Lambert just said, but the statute doesn't say that. Well, Your Honor, I won't replow the ground there. I think that from our perspective, there's two fundamental points. One, agencies are creatures of statute and have only the power and the authority given them. They're not given signature matching authority. Secondly, the general simply knows how to give signature matching authority and has done so in the petition candidate context. So the fact that the same grant of authority is not given here indicates that it is not intended. So from our perspective, Judge, those rules of statutory construction make it abundantly clear. And again, as I said, the court acknowledged and the parties all agreed at the time that signature matching was not appropriate and not permitted, rather. Importantly, not permitted by law. So Mr. Hall, Mr. Hall, this is Judge Quattlebaum. I understand the point that the effect of the injunction is very similar, if not right on all fours with compliance with state law. But if the effect is that way, but the reasoning is based on the federal constitution, how does Pennhurst apply? Well, Your Honor, we don't read the court's order with regard particularly to the first portion of the injunction, that is ordering state officials to file a law as being rooted in the federal constitution. The court says, you know, follow your own rules. That's exactly what Pennhurst addressed. I think in fairness with regard to the federal overlay, this comes in the second issue, and that is the exception, if you will, of the invitation that Judge Gergel's order created, inviting counties to have him approve signature matching protocols if there were no secure provisions. Because signature matching is not permitted by the law, we don't get to that second question. In this case, the league has conflated or fused those two steps into one to say, hey, this is about the United States Constitution. But it's not about the United States Constitution in the first instance and in the first issue, because the question there is, is signature matching permitted under South Carolina law? And the answer to that is unequivocally no. So the second set of concerns articulated and those which the league addresses throughout with regard to those secure provisions are irrelevant in light of the answer to the first question. And I think that's why there is perhaps some confusion as to Judge Gergel's references to the Constitution. Again, I would stress all of the parties in the court understood that signature matching was not permitted under South Carolina law. Let me ask a follow up to that, please. And Mr. Lambert had started talking about the effect of the directive. And is it your position that the injunction order was improper at the time because it did not consider the directive? I don't think the order addresses it at all. And I think the timing that was just referenced may be part of the reason for that. Or is it that the directive changes the circumstances which might or might not lead to a modification of the order? So I'm trying to get to whether it was wrong in the first place, aside from your Pennhurst issue, just based on the fact that the directive had been issued. Your Honor, if I'm understood your question, and I'm not sure that I am, from the General Assembly's perspective, there was never and never has been authority to signature match. So the fact that the executive director said as much in a directive didn't create new law, didn't change anything, didn't do anything, but recite and re-recite what was already understood to be the law. So the directive didn't make any difference at all? Well, it made clear to the extent that anyone claimed there could be a different interpretation of the law, which we reject, it made clear that from the director's perspective that was not possible. And the statute makes clear that in differences of opinion of that kind, the director's opinion or directive governs. So to the extent there was ambiguity in the minds of the county, it was resolved. But there were nine counties of 46 that didn't understand, or more than nine that didn't understand it the way you say it should have been understood. Well, apparently, Your Honor, they didn't understand it prior to the directive, but they apparently did after, because as far as we know, that was the end of signature matching. So you think it's moot now? Is that what you're saying? Your Honor, I'm not going to speak to the issues. I do think there's a mootness issue here simply because the law was clear and the directive was issued. There was never a ballot that wasn't counted because of signature matching. Nothing ever happened to harm any voter's ability to cast a ballot or to have it counted. So I do believe it is moot along the lines that Mr. Lambert described. Mr. Hall, I have one more question. Don't you think that the notice and cure provision of the district court is an example of judges rewriting the law? With great respect for Judge Gergel, I do, Your Honor. We believe that that essentially rewrites the South Carolina code. And that's why speaking here as a lawyer for the Senate and the House, we reserved additional time, separate and apart from the fine argument that Mr. Lambert made, to make it clear. The notice and cure provision is a usurpation of the South Carolina General Assembly's authority and prerogative on the U.S. Constitution and the South Carolina Constitution. And we make that argument as forceful as we know how. Thank you, Mr. Hall. Now, the League of Women Voters and the plaintiffs, Ms. Marley, Julianne Marley. Yes, good afternoon, Your Honor, and may it please the court. I'm Julianne Marley. Thank you. Julianne Marley from Devil Weighs in Plimpton, LLP, here on behalf of the League of Women Voters of South Carolina, the family unit, Mr. Albertus Clea, and Mr. George Hopkins. As Your Honors have noted, when this case commenced, multiple South Carolina counties were engaging in signature matching to review, reject, otherwise validly submitted absentee ballots. They were doing so without any training. They were doing so largely without providing notice to voters, any opportunity to cure, or any other procedural protections. So the district court considered this conduct and concluded that it likely violated the Constitution, that the other winter factors were met, and issued a preliminary injunction on that basis. Appellees respectfully request that this court affirm the injunction. Ms. Marley, if I could, this is Judge Quattlebaum. Setting aside mootness for the time being, the order doesn't even mention the directive at all. And again, I'm assuming that's because it was filed in the evening and it didn't happen because of timing. But how does the issuance of the directive not impact the likelihood of success issue for an injunction and the irreparable harm issue for the injunction? Seems to me that at least needs to be grappled with. Is there any reason that you can look at those two issues with the directive in place and not consider that in the analysis? Well, I think it's important to look at the circumstances that were before the court at the time that the directive was issued. So, you know, Plano's first filed their complaint on October 2nd. They made allegations of signature matching in the complaint. To our knowledge, there was no investigation and certainly no instruction to the county boards not to engage in signature matching after those allegations. On October 9th, Plano submitted the complaint with additional allegations. There was certainly no outreach to the county boards in response to those allegations. There wasn't any investigation of those allegations. Instead, the defendant submitted an affidavit to the court attesting that they were unaware that signature matching was taking place. And as Judge King has already noted, or pardon me, maybe Judge Floyd has already noted, they also submitted in that affidavit that they had been contacted by Charleston County to inquire about the purchase of signature matching software for absentee ballots, which at the very least suggests that Charleston County was considering signature matching. But there's no evidence that in response to that the state did anything to prevent signature matching. So, you know, contrary to the arguments that appellants have made, they didn't act immediately. They didn't act until they were ordered by the district court on the 21st after oral argument to intervene. And so after intervening, they found out that, you know, appellee's allegations were confirmed. So nine counties were engaging in signature matching. One had started signature matching but then stopped. Five counties remained complete unknowns, including Charleston County. One county, Berkeley County, said simply that they were planning to follow Section 715.420 of the statute, which defendants acknowledged was unclear as to whether they were actually engaging in signature matching. So it was only at this point that the October 26 directive is filed. And so then the question is really, you know, at that point, is it an abuse of discretion for the district court looking at this record to conclude that that directive, which doesn't say anything about whether the state is going to take any steps to, you know, to confirm whether it's being complied with, which, you know, didn't itself confirm if it had been received by the county boards. I mean, it doesn't even address it. And so I'm not faulting the plaintiffs or the district court on that. I appreciate how fast things were moving. But how can you have a full assessment of likelihood of success in irreparable harm when, even if it's just a couple hours before the order is issued, there's a directive that says don't do it. So even if everything you're saying, you know, I understand that. But, you know, with that in place, it seems like we would need to know the effect of the directive, you know, if it went into place before the order in order to determine whether the order was appropriate. Well, I mean, certainly the judge is not required to cite everything that he considered in the order. Was the directive ever presented to the court? That's a good question. We're talking about the directive was issued. It's a directive to the counties, right? Or county clerks or election officials of some type? That's right, to the county boards of election. Yes, it was filed. It was directive to them. Was it brought to the attention of the court? Was it filed with Judge Gergel? Yeah, it was filed, I believe, a little after 11 p.m. on the 26th. And then Judge Gergel entered his order, I believe, shortly after 10 a.m. on the 27th. So he had it before him for 24 hours or something? Less than that, about 12. But, yes, he had it in front of him. Twelve hours. He had it before him for 12 hours. Please don't check my math. Yes. Okay. Did anybody go back to him and say, you forgot to mention this directive, Judge? No, I'm not aware of anyone having followed up with that. Neither side ever went back to him and asked him to do anything? No, Judge. Pardon? No, no. Neither side saw it. They found no disappearance. And we struck part of his order or stayed part of his order before the election, did we not, in our order? Well, the parties agreed to be a partial state. But you all agreed to something of his order that we changed. But no one ever went back to Judge Gergel and asked him to do anything? That's correct, Your Honor. Nobody ever went back to him and said, all this stuff's moot, Judge. That's also correct. Right? Nobody ever did. That's correct. No, the appellants did not seek to move the order before the district court. Ms. Marley, let me ask you this. What evidence can you point to that the commission might change its position in the future? So I think, you know, this really, again, just goes back to the record before the court. So appellants' position is that this is the longstanding interpretation of South Carolina law. But the problem is that interpretation doesn't appear to have been conveyed at any point. It certainly wasn't conveyed to the county boards. You know, the affidavit from Defendant Andino, you know, basically says we weren't affirmatively instructing them to engage in signature matching. But it's not clear that it was ever conveyed. It's not suggested that it was ever conveyed that it was prohibited. Well, then what evidence, I mean, what action could the commission take, in your mind, that would be sufficient to moot this case? Well, I mean, first of all, the burden for demonstrating that the action is moot is on the defendants. And all they've pointed to is the October 26 directive. And the problem with the directive is that it's really the type of executive action that can be changed at any time. So, you know, they entered it essentially overnight. There's nothing preventing the defendants from entering a different directive or rescinding that directive. We're not aware of any. What more would you want than what they did? So, I mean, they have a couple of options, I think. I mean, the Election Commission has the authority to enter binding regulations, which can't be revoked at a moment's notice because they're, you know, they could, I suppose, take further action relating to compliance, supervision, and enforcement that they haven't taken to this stage, to our knowledge. You know, again, the only thing that they have pointed to is the October 26 directive. They haven't actually submitted any evidence that signature matching didn't take place after the directive was entered. Now, certainly, we're not – appellants have no evidence that the preliminary injunction hasn't been complied with. But, again, it's the appellant's burden to demonstrate that it's absolutely clear, as the standard, absolutely clear that this conduct won't reoccur again in the future. And because – Is it your position that the issue of lewdness should have been raised first with the district court instead of on appeal? Our position is that if the court is to consider lewdness, it's appropriate for the district court to do that in the first instance, including so that they can hear evidence as to whether or not the case is actually lewd. And I think this was what the court recently – But you didn't say that in a – you didn't say that in your briefing, I think, I don't think. That's the first – this is – it's now, in response to my question, this is the first time you've said that. That's correct. Yeah, that's correct. But why didn't you take that position all along? Well, if I recall correctly, the first submission from the appellants didn't sort of specify lewdness as such. That was really in the reply brief in response to the issue that we raised, that they were really talking about lewdness. But, again, we think that it's also – we also think that the case is not lewd. You know, the only thing that's been pointed to is the October 26 directive. Presumably, if there was anything else to point to, they would have done so. So, you know, our position primarily is that the case is not lewd, that there's a live case or controversy. Well, somebody could have said that if the case was on appeal, the district court couldn't do anything. Correct? Correct, yes. Filing a notice of appeals deprives the district court of jurisdiction. But it doesn't completely. There's a principle that the district court, after the appeal is filed, can act in aid of the appeal. That's right, Your Honor. And it's consideration of a lewdness issue that has never – that would be in acting in aid of the appeal, wouldn't it? Because the court of appeals is normally a court of review rather than first view. That's right, Your Honor. And, I mean, the question of lewdness, I think, the only thing that's really been raised in relation to lewdness is the October 26 directive. And I think, you know, I think it's fairly clear from this court's previous case law that action taken such as a directive, that the defendant retains the authority and the capacity to withdraw, doesn't serve to moot a case. So we would suggest that the lewdness issue just simply isn't present here. Well, do you agree that the notice and cure was in excess of the district court's authority? No, we wouldn't agree. I don't think that this portion of the – I don't think this portion of the order is, you know, rewriting state laws. I believe it was characterized before. I think this is the district court taking the steps that it saw to be necessary and that it saw fit to fashion an equitable remedy to resolve what it saw as the constitutional infirmity of the conduct. So it's not a matter of saying what – you know, again, this is sort of the conflation of state and federal law that results from appellant's argument. But it's not about whether South Carolina law, you know, permits, prohibits notice and cure periods. It's about what would be required to bring the state's conduct in line with the Constitution. There's certainly nothing in the district – Well, in that event, the action that they took, isn't that a reason to stop the thing? Isn't that a reason relevant to our mootness analysis? The fact that they stopped – I'm sorry, Judge, I don't know if you were following. They directed that practice, if they were engaging in it, to stop. Isn't that relevant to our mootness analysis? Well, again, the question is really, you know, whether – it's absolutely clear that the conduct in question is not going to reoccur in the future. And the October 26 directive, because of the way that it was issued and also because of the history, you know, leading up to the issuance of the directive, which was really one of, you know, a lack of supervision, a lack of action, I think, you know, it's – they simply haven't – defendants simply haven't met the burden of demonstrating that it's absolutely clear that that conduct is not going to reoccur in the future. Ms. Morley, I have – this is Judge Quadlobama. I have a question. I'd like you to address your position concerning the league's standing. I'm not talking about the standing of the individuals. I'm talking about the league with particular attention to our lane decision on the issue of interference with mission and diversion of resources. Sure. Absolutely, Your Honor. And, of course, as you're well aware, the court needs only find standing with respect to one of the plaintiffs, so anyone will be sufficient. But with respect to the league in particular and accepting as true all the material allegations in the complaint and construing in favor of the complaining party, the league has pled sufficient standing because they've demonstrated that on the allegations that their ability to provide services that are essential to their functions, so the advocacy services that they provide, such as voter registration, educational assistance, fundraising, have been impaired by the unconstitutional signature-matching procedures because they've had to divert resources away from those essential functions in order to address inquiries from their members and other members of the voting public to investigate ballot rejections, provide additional education as to how to attempt to comply with the various requirements in effect. And so because the challenge procedures interfere with that essential function, under Havens Realty, the league has sufficiently alleged an injury, in fact, which is redressable by the request of relief and traceable to the defendants as the agency that is charged with supervision and enforcement of election laws in South Carolina. And you think that's sufficient under our Lane decision? I think the key question remains whether it's really about whether it's the essential functions of the organization that are being undermined. And so this isn't a case where they've simply made a discretionary decision to use resources to address the conduct that's ongoing. This is a case where they really have no other choice but to expend resources that otherwise would be used for activities essential to their functions. And so it impairs their ability to exercise those essential functions as a result of that. I would just, given that the time is running short, I'd like to just very briefly address the other issue that was raised in the reply brief, which was ripeness. That had never been raised before, had it? No, Judge. And they tried to raise it on the reply brief, but you can't do that on an appeal, can you? They had to raise a ripeness that wasn't raised in the initial brief or in the district court. I believe that their submission is that since it's an Article III issue, it can be raised, and so we'd like to just... Well, it's not, I guess, it can. They can try to do it that way, but they didn't give the district court a shot at it, and they didn't give you a chance to brief it. No, they didn't. And I don't think I'd need much time on it just to point to the court's 2018 opinion on Dealview-Mercer County, which we think is sort of squarely on point here, since the appellees are challenging the program as it exists at the time the complaint was filed and not some future course of action. But really, we think that this is, along with the standing arguments that are made in the appellant's reply brief, we think that these are really just a repackaging of the mootness issue, which we've, of course, already discussed at length today and which we think is not warranted. And then finally, with the court's permission, I'd just like to briefly address the Pennhurst issue that was raised. The suggestion that the critical question on Pennhurst is whether the signature matching also violates South Carolina law and that this relates to the court's authority to enter the injunction is just incorrect. Pennhurst doesn't stand for the proposition that the court's authority hinges on whether the conduct is lawful under state law. It's whether the federal court enjoined conduct on the basis of state as opposed to federal law. And that's just not what the district court did here. It clearly assessed plaintiff's claims, which are federal constitutional claims, assessed them on that basis, assessed them according to the Anderson verdict and Matthews standards, and then issued a preliminary injunction to protect the constitutional rights. And the injunction itself makes very clear that it's based on federal law. So the first sentence of the injunction is not comply with federal law. The first sentence of the injunction is that the state cannot engage in signature matching without providing notice and cure. And I see that my time has concluded, so I'd be happy to answer any further questions. But otherwise, thank you for your attention. Judge Floyd, Judge Quattle, Bob, anything else? No, sir. Thank you, Ms. Marley. We appreciate it. Now, Mr. Lambert. Thank you, Judge King. May it please the court. I have three points I want to make. Yes, Your Honor, my apologies. Three points I want to make on reply. And the first goes to mootness, which this court in Pasch v. Dealey has said the standard is unlikely to recur. Not only do we point to the directive of Director Anzino at page 297 of the record, we also point to the fact that this has been the commission's position for about two decades. That's at page 272 of the joint appendix. And if you look at the handbook that's used to train county election officials, there's specific procedures for what to do with an absentee ballot when it's returned. That's pages 150 to 151 of the joint appendix. If you contrast that with the process for checking signatures on petition applications at page 172 of the joint appendix, you will see exactly what signature matching looks like and when counties have been told to do it. The fact that they were not told not to do it isn't the question. It's that they weren't told to do it because agency authority has to be an express grant. We can't have rules for everything a county might do that's improper. It'd be like having a rule for everything a child isn't supposed to do that you couldn't imagine. You can't imagine telling your 7-year-old don't spray paint the dog. That rule only happens when your 7-year-old grabs a can of spray paint and spray paints the dog. Fundamentally here, the statute has been and is unambiguous using basic tools of statutory construction. This court frequently uses tools of statutory construction at step one of Chevron, which is a doctrine recognized under South Carolina law, to determine whether a statute that is put into effect by an agency is in fact ambiguous or not. And those tools here, both the Medical Society decision from the Supreme Court of South Carolina and the contrast with Section 71185, both point to the conclusion that 715.420 is unambiguous. And because it's unambiguous, the commission's directive cannot change. It's why the commission's directive is what its position has always been, which is there is no signature matching under South Carolina law. That ambiguity, to that lack of ambiguity, goes to my second point, which is to the first part of the district court's injunction. Whether or not the directive was issued, it would have been improper because the question here is not, is signature matching without noticing cure procedures sufficient? It's, can you have signature matching? And if you can, are the procedures sufficient? Because the first question is answered in the negative, there's no need under the Canada constitutional avoidance to even deal with the second. On this point, the Fifth Circuit's recent decision in the Valentine case is instructive. That involved an Eighth Amendment challenge to COVID regulations for the Texas Department of Corrections. An injunction was entered by the district court in the Fifth Circuit, stated pending appeal, writing the district court acknowledged that its injunction largely overlapped with the department's COVID-19 policy requirements and recommendations. And the district's courts view this was a virtue and not a vice because its injunction would promote compliance with its own policies. And then the district, excuse me, the Fifth Circuit said Pennhurst plainly prohibits such an injunction. If you substitute Texas Department of Corrections and COVID-19 policies for South Carolina election officials and signature matching, the analysis is exactly the same. And my third point goes to the second part of the injunction, the noticing cure procedures. It's important to keep in mind here that signature matching is not required under the federal constitution for absentee voting to comply with constitutional requirements. Therefore, the district court's injunction ignores one of two statutes. If 420 is unambiguous, it reads that prohibition or lack of authority for signature matching out of state law and allows it. If somehow that provision is ambiguous, the district court's injunction reads the executive director's authority under 7325 to settle disputes with county boards out of state law. Either one was error, and therefore the district court's injunction should be reversed. Thank you. Anything else, Judge Floyd, Judge Bottlebaum? No, sir. No, sir. Well, we appreciate the arguments of counsel. If we were in Richmond with you, we would leave the bench and shake your hands and congratulate you on doing a good job. And maybe next year we'll be able to do that. But in these circumstances, we'll simply take this case under advisement. Wish you all the best. And Madam Clerk, we'll take steps to go to the next case. Thank you, Your Honors. Thank you, Your Honors. Thank you, Your Honors.
judges: Robert B. King, Henry F. Floyd, A. Marvin Quattlebaum Jr.